Randall J. Sunshine (SBN 137363)
    rsunshine@linerlaw.com
Angela C. Agrusa (SBN 131337)
    aagrusa@linerlaw.com
Sterling L. Cluff (SBN 267142)
    scluff@linerlaw.com
LINER GRODE STEIN YANKELEVITZ
SUNSHINE REGENSTREIF & TAYLOR LLP
1100 Glendon Avenue, 14th Floor
Los Angeles, California 90024.3503
Telephone:   (310) 500-3500
Facsimile:   (310) 500-3501

Attorneys for Defendant
HILTON GRAND VACATIONS COMPANY, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN CONNELLY, MARY ALICIA SIKES, and KEITH MERRITT on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>        vs.<br><br>HILTON GRAND VACATIONS COMPANY, LLC,<br><br>            Defendant. | Case No. CV12-0599 JLS (KSC)<br><br>**DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:     June 28, 2013<br>Time:    1:30 p.m.<br>Crtrm.:  4A<br><br>The Hon. Janis L. Sammartino<br><br>Date Action Filed: March 12. 2012 |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ..................................................................................... 1

II.     STATEMENT OF FACTS ....................................................................... 3

    A.    HGV's Telephone Marketing Activities .................................................. 3

    B.    HHonors Members Voluntarily Provide Their Cell Numbers And Consent To Being Contacted In Several Non-Common Ways ............. 6

    C.    Hilton Guests Voluntarily Provide Their Cell Numbers and Consent to Being Contacted In Non-Common Ways ............................ 8

    D.    Individual Inquiries Would Be Necessary To Determine If An HHonors Member And/Or Hilton Guest Received A Call On A Cellular Telephone ................................................................................ 11

III.    PLAINTIFFS FAIL TO MEET THEIR BURDEN OF ESTABLISHING THE PROPRIETY OF CLASS CERTIFICATION .......... 13

    A.    The Putative Class and Subclasses Are Not Ascertainable .................. 14

    B.    Plaintiffs Fail To Satisfy All The Requirements Of Rule 23(a) .......... 16

        1.    Plaintiffs Failed to Demonstrate That There Are Questions Common to the Putative Class Resulting In Common Answers ....................................................................................... 16

        2.    Plaintiffs' Claims Are Not Typical of the Putative Class Members ..................................................................................... 20

    C.    Plaintiffs Fail To Meet The Requirements of Federal Rule of Civil Procedure 23(b)(3) ...................................................................... 21

        1.    Plaintiffs Fail To Demonstrate That Common Questions Predominate .......................................................................... 21

        2.    Plaintiffs Fail To Demonstrate That A Class Action Is the Superior Method Of Adjudication ............................................... 22

    D.    Plaintiffs' Request For Certification Under Rule 23(b)(2) Lacks Merit ..................................................................................... 24

IV.     CONCLUSION ...................................................................................... 25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3
**CASES**

4
5
*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591, 117 S. Ct. 2231 (1997) .................................................................. 13

6
7
*Blackwell v. Skywest Airlines, Inc.*,
  245 F.R.D. 453 (S.D. Cal. 2007) ......................................................................... 24

8
9
*Blanco v. CEC Entm't Concepts L.P.*,
  No. EDCV-07-90-ODW, 2008 WL 239658 (C.D. Cal. Jan. 10, 2008) ............. 23

10
11
*Dukes v. Wal-Mart, Inc.*,
  509 F.3d 1168 (9th Cir. 2007) ............................................................................. 24

12
*Elliott v. ITT Corp*,
  150 F.R.D. 569 (N.D. Ill. 1992) .......................................................................... 24

13
14
*Emanuel v. Los Angeles Lakers, Inc.*,
  No. CV 12–9936–GW(SHx), 2013 WL 1719035 (C.D. Cal. April 18, 2013) .. 14

15
16
*Forman v. Data Transfer, Inc.*,
  164 F.R.D. 400, 403 (E.D.Pa. 1995) ....................................................... 16, 22, 23

17
18
*Freedman v. Advanced Wireless Cellular Commc'ns., Inc.*,
  No. SOM-L-611-02, 2005 WL 2122304 (N.J. Super. Ct. June 24, 2005) ......... 22

19
20
*G.M. Sign, Inc. v. Brinks Mfg. Co.*,
  No. 09-C-5528, 2011 WL 248511 (N.D. Ill. Jan. 25, 2011) ....................... 17, 21

21
22
*Gannon v. Network Tel. Servs., Inc.*,
  No. 2:12-cv-09777-RGK-PJW,
  2013 WL 2450199 (C.D. Cal. June 5, 2013).......................................... 1, 14, 15

23
24
*Gene and Gene, LLC v. BioPay, LLC*,
  541 F.3d 318 (5th Cir. 2008) ................................................... 17, 19, 20, 21

25
26
*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ........................................................................... 20

27
28
*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ............................................................................... 13

DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

*Ibey v. Taco Bell Corp.*,
     2012 U.S. Dist. LEXIS 91030 (S.D. Cal. June 18, 2012) ................................. 14

*In re Trans Union Corp. Privacy Litig.*,
     211 F.R.D. 328 (N.D. Ill. 2002) ...................................................................... 23

*Jamison v. First Credit Servs., Inc.*,
     No. 12-C-4415, 2013 WL 1248306 (N.D. Ill. Mar. 28, 2013) ...................... 2, 15

*Kavu, Inc. v. Omnipak Corp*,
     246 F.R.D. 642 (W.D. Wash. 2007) ................................................................. 20

*Kline v. Coldwell, Banker & Co.*,
     508 F.2d 226 (9th Cir. 1974) ........................................................................... 24

*Lee v. Stonebridge Life Ins. Co.*,
     289 F.R.D. 292 (N.D. Cal. 2013) ..................................................................... 19

*Legge v. Nextel Commc'ns, Inc.*,
     No. CV-02-867 DSF, 2004 WL 5235587 (C.D. Cal. June 25, 2004) ............... 23

*Levine v. 9 Net Ave., Inc.*,
     No. A-1107-00T1, 2001 WL 34013297 (N.J. Super. App. Div. June 7,
     2001) ................................................................................................................ 22

*London v. Wal-Mart Stores, Inc.*,
     340 F.3d 1246 (11th Cir. 2003) ................................................................. 22, 23

*Manno v. Healthcare Revenue Recovery Grp.*,
     No. 11-61357, 2013 WL 1283881 (S.D. Fla. Mar. 26, 2013) .......................... 19

*Machesney v. Lar-Brev of Howell, Inc.*,
     No. 10-10085, 2013 WL 1721150 (E.D. Mich. Apr. 22, 2013) ...................... 2, 14

*Messner v. Northshore Univ. Healthsystem*,
     669 F.3d 802 (7th Cir. 2012) ........................................................................... 16

*Mims v. Arrow Fin. Servs.*,
     132 S. Ct. 740 (2012) ................................................................................... 1, 22

*Mitchem v. Illinois Collection Serv., Inc.*,
     271 F.R.D. 617 (N.D. Ill. 2011) ....................................................................... 20

*Murphey v. Lanier*,
     204 F.3d 911 (9th Cir. 2000) ........................................................................... 22

DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

*Pinkard v. Wal-Mart Stores, Inc.*,
    2012 U.S. Dist. LEXIS 160938 (N.D. Ala. Nov. 9, 2012)................................. 14

*Saunders v. NCO Fin. Sys., Inc.*,
    No. 12-CV-1750 BMC, 2012 WL 6644278 (E.D.N.Y. Dec. 19, 2012) .............. 1

*Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*,
    279 F.R.D. 442 (N.D. Ohio 2012) ..................................................................... 19

*Ticor Title Ins., Co. v. Brown*,
    511 U.S. 117 (1994) ......................................................................................... 25

*Vandervort v. Balboa Capital Corp.*,
    287 F.R.D. 554 (C.D. Cal. 2012).......................................................... 14, 15, 16

*Versteeg v. Bennett, Deloney & Noyes, P.C.*,
    271 F.R.D. 668 (D. Wyo. 2011) ................................................................. 17, 21

*Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*,
    274 F.R.D. 229 (S.D. Ill. 2011) ........................................................................ 15

*Wal-Mart v. Dukes*,
    131 S. Ct. 2541 (2011) ....................................................................... 13, 16, 17

*Williams v. Oberon Media, Inc.*,
    468 F. App'x 768 (9th Cir. 2012)...................................................................... 14

*Wilson v. Am. Cablevision of Kansas City, Inc.*,
    133 F.R.D. 573 (W.D.Mo. 1990) ...................................................................... 23

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180, *as amended*, 273 F.3d 1266 (9th Cir. 2001) ........................... 24

STATUTES

47 U.S.C. § 227................................................................................................... 1, 17

OTHER AUTHORITIES

Federal Rule of Civil Procedure 23 .........................................13, 16, 20, 21, 24, 25

TCPA of 1991, Commc'n Innovators Pet. for Decl. Ruling, Comments of the
    U.S. Chamber of Commerce, CG Docket 02-278............................................... 1

# I.    <u>INTRODUCTION</u>

Plaintiffs Brian Connelly and Keith Merritt seek to certify a class of hotel guests who are "fed up" and "annoyed" by telephone calls from Hilton Grand Vacations Company, LLC ("HGV").  However, Plaintiffs cannot certify a class based on the idiosyncratic and inherently individualized emotional response that consumers had to receiving a telephone call from a hotel brand with which they have a longstanding relationship and demonstrated loyalty.  Moreover, Plaintiffs' claim for aggregated statutory damages for as much as $18 to $57 billion as compensation for being fed up and annoyed is without any legal or factual support under the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(A) ("TCPA"); it is unconscionable on every level.

The TCPA was enacted to protect against "the proliferation of intrusive, nuisance calls."  *Mims v. Arrow Fin. Servs.*, 132 S. Ct. 740, 744 (2012). Nevertheless, the TCPA's private right of action and statutory damages provision of $500 per call has resulted in the increase of federal lawsuits brought under the TCPA by more than 500% between 2008 and 2011.  *See* In the Matter of Rules and Regulations Implementing the TCPA of 1991, Commc'n Innovators Pet. for Decl. Ruling, Comments of the U.S. Chamber of Commerce, CG Docket 02-278, p. 5. "Like many statutes . . . remedial laws can themselves be abused and perverted into money-making vehicles for individuals and lawyers.  This may be one of those cases."  *Saunders v. NCO Fin. Sys., Inc.*, No. 12-CV-1750 BMC, 2012 WL 6644278, *3  (E.D.N.Y. Dec. 19, 2012) (plaintiff's case failed under the TCPA because he gave "prior express consent" to be contacted by defendant).

In fact, within the last 60 days (and as recently as last week), courts have refused to grant class certification cases that clearly abuse the TCPA and class action law.  *See, e.g.*, *Gannon v. Network Tel. Servs., Inc.*, No. 2:12-cv-09777-RGK-PJW, 2013 WL 2450199, at *2-3 (C.D. Cal. June 5, 2013) (class certification "improper" because the facts of the case would require the court to hold "mini-trials" to

DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

1 determine who received unauthorized text messages in order to determine class

2 membership); *Machesney v. Lar-Brev of Howell, Inc.*, No. 10-10085, 2013 WL

3 1721150, at *18 (E.D. Mich. Apr. 22, 2013) (denying certification where the class

4 definition yielded multiple plaintiffs stemming from one potential violation); *Jamison*

5 *v. First Credit Servs., Inc.*, No. 12-C-4415, 2013 WL 1248306, at *15-16 (N.D. Ill.

6 Mar. 28, 2013) (denying certification where the class definition included thousands of

7 individuals who consented to receiving calls on their cellular telephones and thus had

8 no grievance under the TCPA). Plaintiffs' action here, premised upon even more

9 tenuous allegations, demands a similar outcome.

10       Indeed, Plaintiffs, who suffered no harm or injury, are not only unable to

11 establish any actionable claim for violations of the TCPA, they cannot meet the

12 necessary requirements for class certification. Plaintiffs Messrs. Connelly and

13 Merritt, HHonors Members and loyal Hilton Guests, each consented to calls from

14 HGV by willingly and deliberately giving their cellular telephone numbers as their

15 preferred means to be contacted. HGV is a subsidiary of Hilton Worldwide, Inc.

16 ("Hilton") that provides unique travel opportunities to members of the Hilton family.

17 HGV develops, manages, markets and operates a system of exclusive, high-end

18 resorts that members of the Hilton family can jointly-own along with other Hilton

19 family members. Ownership of an HGV interest entitles members to exclusive use of

20 the properties and the exchange of visits to other HGV resorts worldwide. HGV

21 advertises its resort properties through direct telephone marketing solely to guests of

22 the Hilton family of hotels ("Hilton Guests") and Hilton HHonors Program members

23 ("HHonors Members"), and offers incredible savings for travel as an incentive to its

24 loyal customers to learn about HGV's ownership properties. Hilton does not make

25 cold-calls or call people who are not otherwise a part of the Hilton family and who

26 have voluntarily provided their contact information to Hilton.

27       In light of these facts, the Court must deny class certification for the following

28 reasons:

2

DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

1    First, Plaintiffs fail to adequately define a class that is ascertainable using

2 objective criteria.  The proposed class definitions would improperly require the Court

3 to decide individuals' ability to prevail on their claims in order to determine

4 membership in the class.  The proposed classes would require individual inquiries

5 concerning, for example, whether HGV called cell numbers belonging to potential

6 class members and the manner in which potential class members consented to

7 receiving calls from HGV.

8    Second, Plaintiffs cannot show commonality as individual issues predominate

9 within each of the proposed classes, including how members of the putative classes

10 consented to the calls, how HGV dialed cell numbers, and the non-common,

11 individual ways in which HGV connected with the putative class.

12    Third, Plaintiffs' claims are not typical of all those in the putative class because

13 the manner in which members of the putative class provided consent varied.

14    Fourth, class certification should be denied because it is not the superior

15 method of adjudication of a TCPA claim.  The drafters of the TCPA intended for the

16 available statutory damages remedy to motivate plaintiffs to bring individual actions,

17 rendering class action treatment unnecessary.  This is underscored by the fact that

18 statutory damages in this case would yield potential damages in the billion dollar

19 range.  These numbers are grossly disproportionate to actual harm suffered by the

20 proposed class, evidencing that class wide treatment is inappropriate.[1]

21 **II.    STATEMENT OF FACTS**

22    **A.    HGV's Telephone Marketing Activities**

23    HGV employs a specific, narrowly tailored telephone marketing plan to

24 introduce its resort properties to those Hilton customers that HGV has determined

25 may have interest in the advantage of the ownership opportunities with Hilton.  Those

26 _____

[1] Plaintiffs' argument that their request for class certification is based primarily on

27 injunctive relief is disingenuous.  Injunctive relief is merely an ancillary remedy to

28 this financially driven class action.

1  customers are select Hilton Guests and HHonors Members.  Gust Decl. ¶¶ 3-4.

2  HHonors Members are those guests who have applied for and participate in the

3  Hilton HHonors loyalty program, an exclusive points-based loyalty program (the

4  "HHonors Program"), and Hilton Guests are those persons who stayed at the Hilton

5  family of brand hotels.

6       Through its marketing campaign, HGV invites select Hilton Guests and

7  HHonors Members to learn about its resort properties by offering significantly

8  discounted vacations at Hilton Brands, brands for which they have an ongoing

9  preference and relationship.  Gust Decl. ¶¶ 3-6.  In exchange, Hilton Guests and

10  HHonors Members tour the resort property and learn more about ownership

11  opportunities during their stay.[2]  HGV directs these efforts exclusively to select

12  Hilton Guests and HHonors Members; it does not cold call or solicit non-Hilton

13  customers or persons who have not otherwise opted to receive marketing from HGV.

14  Gust Decl. ¶ 4.  HGV's efforts are directed toward select persons that HGV has

15  determined, through its internal evaluation, are inclined to be interested in ownership

16  opportunities at HGV properties.  Additionally, those Hilton Guests and HHonors

17  Members that are contacted voluntarily provided their cell number and agreed to be

18  contacted at that number.  Cluff Decl. Exh. A 13:20-14:12; Exh B. 139:16-23; Gust

19  Decl. ¶¶ 11-13.

20       One of HGV's primary focuses in crafting its telemarketing strategy was to

21  ensure compliance with the TCPA and similar laws.  Gust Decl. ¶¶ 9-10; Allen Decl.

22  ¶ 2; Cluff Decl. Ex. A 73:9-74:24.  To that end, HGV purchased the Liberation 6000

23  system ("Liberation") because "[TDI, Inc.] worked specifically with the FTC and

24  FCC to build a system that complied with all the rules and regulations, and built it in

---

[2] Packages range from two to five nights in Orlando, Las Vegas, Manhattan,
Honolulu, Waikoloa, Myrtle Beach, or Park City for as little as $149 a night.  Offers
may also include gifts such as HHonors points, theme park tickets, gift certificates for
rebates on flights and/or additional hotel stays.  Gust Decl. ¶ 4-5.

1  collaboration with those governmental entities."  Cluff Decl. Exh. A 73:9-24.

2      Liberation has the ability to utilize separate equipment and programs for calls

3  to landline telephones ("Landline Equipment") versus calls to cellular telephones

4  ("Cellular Equipment"); this functionality was a key factor in HGV's decision to

5  purchase Liberation.  Allen Decl. ¶ 3.  The Cellular and Landline Equipment "work

6  completely differently" and utilize different software and hardware.  Cluff Decl. Exh.

7  A 51:12-54:3; 114:6-115:18; 175:19-179:4; 181:14-184:9; 184:20-185:18; 193:20-

8  195:7; Exh. B 88:18-90:18; 117:2-119:13; 123:3-124:9; 138:6-139:13; 142:11-

9  144:15; 184:21-190:20; 196:16-199:24.  The Landline Equipment, running in

10  "Predictive Mode," uses a pacer, call progress analysis and related software to

11  automatically dial landline telephone numbers and route the calls if the software

12  detects a live human response; the Cellular Equipment does not utilize this equipment

13  and cannot achieve this functionality.  *Id.*

14      By contrast, the Cellular Equipment intentionally prevents cell numbers from

15  being dialed without human intervention.  Allen Decl. ¶ 5; Cluff Decl. Exh. A 51:12-

16  54:3; 73:9-74:24; 114:6-115:18; 175:19-179:5; 181:14-184:9; 184:20-185:18;

17  193:20-195:7.  As HGV's Vice President of Marketing, Mr. Gust, testified:

18      [C]ellular telephones can never be dialed without a human initiating the
        call by pressing dial now, listening to the entire process of the call,
19      listening to the dial tone, listening to the ring, listening for an answering
        machine, listening for a human response, and then engaging the
20      customer.  And then post call, dispositioning what happened on the call
        before any other – before they can take another call or initiate another
21      call.

22  Cluff Decl. Exh. A 114:9-17.

23      To further ensure compliance with the TCPA, HGV employs a data "hygiene

24  process" to ensure compliance with the TCPA by verifying that the numbers it

25  receives for HHonors Members and Hilton Guests are correctly designated as a

26  landline or cell number.  Cluff Decl. Ex. A 13:24-14:12; 54:4-62:10; 185:1-18; Ex. B

27  36:16-37:5; 40:10-45:18; 70:15-73:25.  After undergoing the hygiene process, cell

28  numbers are separated from landline numbers and are then called, one at a time, by

DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

1  agents using the Cellular Equipment.  Cluff Decl. Exh. B 52:23-53:7; Allen Decl. ¶¶

2  4-7.[3]

3          Inexplicably, Plaintiffs claim that they were inundated with calls from HGV

4  that were made using an ATDS because each call had a delay prior to a live person

5  coming on the line.  Ptfs.' Mot. 2:13-19.  However, Plaintiffs only spoke to HGV

6  agents three times in four years and none of those calls involved a delay.  Allen Decl.

7  ¶ 5.

8     **B.**     **HHonors Members Voluntarily Provide Their Cell Numbers And**

9          **Consent To Being Contacted In Several Non-Common Ways**

10          Guests may apply to become HHonors Members and consent to receive calls in

11  a variety of ways.  Gust Decl. ¶¶ 10-11.  Guests may enroll by submitting a paper

12  enrollment application by mail, enrolling in person at a Hilton hotel, via telephone or

13  by completing enrollment online.  Cluff Decl. Exh. A. 41:9-16; 123:6-135:8; 153:12-

14  154:15; Gust Decl. ¶ 12.  These enrollment methods are significantly different from

15  one another and, consequently, individual experiences of the HHonors Members vary

16  drastically from person to person.  Gust Decl. ¶¶ 12-17.  These differences, described

17  further below, evidence the lack of commonality for the putative class as follows:

18      ***Online Application.***  Online enrollment includes fields for the applicants' first

19  and last name, mailing address, email address, and telephone number and type.  With

20  the exception of "telephone number," these fields are preceded by asterisks indicating

21  that the field is required.  Gust Decl. ¶ 15, Exh. N.  Online applicants are also

22  required to accept the Terms and Conditions of the HHonors Program.  Gust Decl. ¶¶

23  14-15, Exh. N.

24  _____

25  [3] Plaintiffs misattribute Mr. Allen's testimony about Landline Equipment to Cellular

26  Equipment.  Ptfs.' Mot. 7:17-10:10.  When asked whether the Cellular Equipment

27  had the capacity to automatically dial cell numbers, Mr. Allen unequivocally and
    repeatedly stated, "No, not in the way it's been configured."  Cluff Decl. Exh. B

28  164:11-22.

Specifically, Mr. Connelly enrolled in the HHonors Program online and **voluntarily** provided Hilton with his cell number during that process.  Gust Decl. ¶ 16.  During his online application process, Mr. Connelly clicked a box indicating that by creating his HHonors account, he "agree[d] to the HHonors Program Terms and Conditions, our Expiration Policy, and our Global Privacy Policy (Updated Dec 2011)."  Gust Decl. ¶¶ 15-16.  Each of these documents is easily accessible for review by a visible and obvious hyperlink.  *Id.*  By checking the box, Mr. Connelly and the other putative class members who applied to be HHonors Members online agreed to the HHonors Terms and Conditions, which state:

> We process your personal information in accordance with the <u>Hilton Global Privacy Policy</u> (the "Privacy Policy").
>
> We may also use and share your personal information in the ways described below, in addition to what is described in the <u>Privacy Policy</u>. These Terms and Conditions supplement the Privacy Policy with respect to our processing of the personal information of HHonors Program Members. . . .
>
> In addition to the uses and sharing described in the <u>Privacy Policy</u>, we may also use and share relevant portions of your personal information in order to administer the HHonors Program.  This may include sharing your personal information with our business partners in order to credit you with mileage or other benefits earned through your participation in the HHonors Program.

Gust Decl. Exh. R, HGV5485-5486.[4]

By checking the box, Mr. Connelly and the putative class members who enrolled online agreed to Hilton's Global Privacy Policy, which states that:

> We use your personal information to provide the **services you request** from Hilton such as to **facilitate: reservations; the purchase of a vacation package or timeshare**; purchases from the Hilton To HomeT; the booking of airfares and rental cars; membership in the HHonors program; and other transactions. . . . We also use details to send you newsletters, promotions and featured specials, and to conduct online

---

[4] HGV's calls to Mr. Connelly were initially covered by the 2010 version of the HHonors Terms & Conditions.  The 2006 version in place when Mr. Connelly joined the HHonors Program provides that his "continued use in the HHonors Program following the posting of changes to these terms will mean that you accept these changes."  Gust Decl. Exh. S, HGV080.

1  surveys, sweepstakes, prize draws, and other contests via email,
2  telephone or postal mail.

3  Gust Decl. Exh. T, HGV119 (emphasis added).[5]

4  **_Paper Application._**  Persons who enroll in the HHonors Program through paper
5  applications have a different experience than persons who enroll online.  Paper
6  applications contain a space for the applicant to provide a telephone number.
7  However, there is no indication that a telephone number is required.  Gust Decl. ¶¶
8  12-13, 17; Exh. O.  While online applicants check a box agreeing to the HHonors
9  Terms and Conditions and Hilton's Global Privacy Policy, the paper application
10  advises applicants that:

11  By submitting this form, you agree to the HHonors Terms and
   Conditions and the Privacy Policy located on our website and available
12  at the front desk.  ***You also acknowledge and agree that your personal
   information will be used to***: administer the HHonors program, provide
13  services and products, analyze your travel accommodation preferences,
   ***make special offers or promotions by email, telephone or post, as well
14  as for other purposes detailed in our Privacy Policy***.

15  Gust Decl. Exh. O.

16  **_Telephone Application._**  Finally, while the telephone application requests the
17  same contact information as the online and paper applications, there is no uniform
18  script or process by which members are enrolled in the HHonors Program via
19  telephone.  Gust Decl. ¶¶ 12,14-18.  Some telephone applicants are prompted to
20  respond through an automated questionnaire, while others speak with a live Hhonors
21  Program representative.  *Id.*

22  ## C.   <u>Hilton Guests Voluntarily Provide Their Cell Numbers and Consent</u>
23  <u>to Being Contacted In Non-Common Ways</u>

24  Hilton Guests voluntarily provide cell numbers to Hilton and consent to
25  Hilton's Global Privacy Policy in various ways depending on whether the Hilton

26  ---
27  [5] Hilton's Global Privacy Policy was updated in December 2011 and clarified that
   Hilton would contact individuals "online and via email, telephone, mobile/text
28  message (including SMS and MMS) and postal mail."  Gust Decl. Exh. U, HGV108.

1  Guest made a reservation online, by telephone, or through online travel agencies like
2  Expedia, Orbitz and Travelocity ("OTAs"), traditional travel agents, third parties
3  (e.g., spouse, business partner, friend) or in person at the time of check in.[6]  Gust
4  Decl. ¶¶ 19-25.

5      ***Online Reservations.***  While booking their hotel stays online, Mr. Connelly
6  and various members of the putative class voluntarily provided their cell number to
7  Hilton and agreed to Hilton's Global Privacy Policy.  Cluff Decl. Exh. C 35:14-
8  37:20; 38:17-41:24; 95:9-19; 106:21-108:12; 112:4-12; Gust Decl. ¶¶ 19-21; Exh. L
9  HGV1441-1442.  During the online reservation process, Hilton advises guests of
10  Hilton's Global Privacy Policy prior to requesting the guest's contact information.
11  Guests receive additional notice of Hilton's Global Privacy Policy in an email
12  confirming their reservation.  Gust Decl. ¶¶ 21, 23-24; Cluff Decl. Exh. K,
13  CONNELLY010-012, 017-018.

14      ***Phone Reservations.***  Mr. Merritt and other members of the putative class
15  booked their hotel reservations by phone.  Because telephone reservations are not
16  taken pursuant to a script, there is no way of uniformly determining what was said to
17  those guests about Hilton's Global Privacy Policy during their telephone reservation.[7]
18  Cluff Decl. Exh. D 39:2-40:13; 41:24-45:6; 264:15-269:19; Gust Decl. ¶ 22.  After
19  making the telephone reservation, approximately 85% of the guests received a
20  confirmation of their reservation notifying them of Hilton's Global Privacy Policy.

---

21  [6] A guest's first and last name, email and physical address are required to make a
22  reservation.  Gust Decl. ¶ 19.  A telephone number may or may not be required
23  depending on the hotel.  *Id.*  Cell numbers are *never* required.

24  [7] Mr. Merritt claims that at the Saratoga Hilton the front desk clerk said "no, no, no
25  its [sic] like, we're not going to call you or anything, and he made a joke about it, and
   then he said its [sic] like if you leave your wallet in your room or something, we can
26  give you a call and tell you we found your property."  Cluff Decl. Exh. D 20:9-21:7;
27  302:19-308:17, Exh. E, Resp. No. 19; Exh. F, Resp. No. 2.  However, when Mr.
   Merritt checked in to the Hilton Doubletree, he was not asked for his telephone
28  number.  Cluff Decl. Exh. D 41:14-43:15.

1  Gust Decl. ¶ 22; Cluff Decl. Exh. K CONNELLY001-005.  Because telephone

2  reservations are handled differently depending on the course of the call, individuals

3  who made reservations by telephone would need to be examined to determine what

4  information each received with respect to Hilton's Global Privacy Policy and whether

5  each received a confirming email including Hilton's Global Privacy Policy.

6      ***OTA/Travel Agent Reservations.***  Other Hilton Guests and putative class

7  members booked reservations through OTAs or traditional travel agents.  Cluff Decl.

8  Exh. A 17:13-21:19; 32:5-34:2; Exh. D 268:8-269:12; Gust Decl. ¶¶ 23-26.   In these

9  instances, all interaction with Hilton was done exclusively through the OTA or travel

10 agent.  Gust Decl. ¶¶ 23-26.  As such (and unlike guests who booked directly through

11 Hilton), individuals who utilized OTAs and travel agents may not have voluntarily

12 provided their cell numbers or received direct notice of Hilton's Global Privacy

13 Policy.  The guest interacts directly with the OTA or travel agent, who in turn

14 interacts with Hilton; there is no direct contact between the guest and Hilton until the

15 guest checks in to the Hilton hotel.

16      Many OTAs and travel agents have their own independent terms and

17 conditions and privacy policies that govern the reservations they make for customers,

18 which may or may not have directed the putative class members to review Hilton's

19 policies.  *Id.*  Thus, all reservations made through an OTA or travel agent must be

20 reviewed to determine whether the putative class members utilizing those services

21 consented to receiving calls from HGV.

22      ***Third Party Reservations.***  Some putative class members (including Mr.

23 Merritt) may have made reservations through a third party such as a spouse, partner,

24 secretary or friend.  Cluff Decl. Exh. D 265:6-267:6; Gust Decl. ¶¶ 22, 25.  That third

25 party may have provided the class member's contact information and consented to

26 Hilton's Global Privacy Policy without the putative class member's knowledge,

27 consent, and/or understanding of what he or she was consenting to.  Cluff Decl. Exh.

28 D 265:6-267:6; Gust Decl. ¶ 25.  Thus, each putative subclass member would have to

disclose whether he or she:  (1) authorized the third party to provide the cell number;
(2) authorized the third party to consent to Hilton's Global Privacy Policy; (3) was
notified of the existence of Hilton's Global Privacy Policy by the third party; and
(4) understood he or she was consenting to being contacted via cell number.

*Check In Process.*  Individuals may also provide their cell numbers during
check in if that information has changed or was not previously provided to Hilton.
Gust Decl. ¶ 26.  Hilton's employees are encouraged to confirm existing contact
information and ask for any missing information.  *Id.*  However, there is no script for
the check in process.  Accordingly, there is no way to determine which guests
voluntarily provided their cell numbers, received representations regarding the use of
the cell number, or were advised or already aware of Hilton's Global Privacy Policy
during the check in process.  *Id.*  Thus, each putative class member who provided a
cell number during check in would have to disclose whether he or she:  (1) received
representations regarding Hilton's use of the cell number; (2) received Hilton's
Global Privacy Policy or representations about it; and (3) understood he or she was
consenting to being contacted via cell number.

### D.  Individual Inquiries Would Be Necessary To Determine If An HHonors Member And/Or Hilton Guest Received A Call On A Cellular Telephone

Specific inquiry into each putative class member's phone records and
experiences is necessary to determine whether he or she falls within the class
definition; one cannot merely review HGV's records to determine with certainty
whether dialed calls were received on a cellular telephone.  There are at least three
circumstances requiring specific inquiry or examination of the individual putative
class member's telephone records to determine whether he or she falls within the
class definition.

First, while telephone numbers obtained through voice over internet protocol
("VoIP") services such as Google Voice, Skype or GrooveIP may *appear* to be cell

1  numbers, they are not.  Allen Decl. ¶ 9.  In fact, VoIP numbers are not tethered to a

2  single cellular telephone, but rather allow the subscriber to receive calls on any

3  internet capable device, including computers, tablets, smart phones, and even landline

4  telephones.  Specific inquiry would need to be conducted into *each* apparent cell

5  number to determine that it is not a VoIP number and may be included in the class.

6  Cluff Decl. Exh. A 69:5-70:19; Allen Decl. ¶¶ 9, 12.

7       Second, certain calls may have ultimately connected with a cellular phone for

8  reasons beyond HGV's control.  For example, when a guest forwards his or her

9  landline number to a cell number, HGV has no way to detect that this has occurred.

10  As one example, HGV's telephone records reflect that HGV called former plaintiff

11  Mary Alicia Sikes exclusively on her landline number.  Gust Decl. Exh. P; Cluff

12  Decl. Exh. A 112:5-113:1; 185:1-18; Exh. B 81:8-13; 205:9-206:24; Gust Decl. Exh.

13  Q, HGV1373; Allen Decl. ¶¶ 9-10.  Ms. Sikes likely caused the call to connect with

14  her cell phone, however, by using the call forwarding function on her landline

15  telephone.  Cluff Decl. Exh. H, Resp. Nos. 2-3; Exh. G, AT&TSIKES136; Gust Decl.

16  Exh. Q; Allen Decl. ¶ 10.

17       HGV has no responsibility or liability for these calls.  Yet, if liability were

18  somehow imputed, in order to determine when and if putative class members

19  forwarded calls from their landlines to their cell phones, HGV's records would have

20  to be compared with the cell phone records of each individual member of the putative

21  class.[8]  This process would require rigorous and tedious individualized inquiries.

22  _____

23  [8] In a "narrow" or limited set of circumstances, it may be possible that HGV dialed a

24  landline number that had been "ported" to a cell number.  Porting occurs when a
   consumer elects to move his or her existing telephone number from a landline

25  number to a cell number (or vice versa), thereby keeping their existing phone number
   but switching the type of telephone on which calls are received.  Cluff Decl. Exh. A

26  68:11-69:4; Exh. B 78:7-15; 79:20-80:12; Allen Decl. ¶ 8.  Although HGV makes

27  efforts to identify and address numbers that have been "ported" from landlines to cell
   numbers, it is possible that some were missed.  Significantly, there is no way to

28

1    Third, HGV's records demonstrate that many potential members of the putative

2    class incorrectly claim to have received calls from HGV.  In such instances, HGV's

3    telephone records would need to be compared with each individual putative class

4    member's telephone record to verify the validity of his or her inclusion within the

5    class.  For example, Mr. Merritt claims to have received an additional call from HGV

6    on either December 28 or December 29, 2011.  This call cannot be proven by

7    reference to either HGV's call records or Mr. Merritt's cell phone records.  Cluff

8    Decl. Exh. D 194:2-15; 205:5-23; 222:20-223:7; Exh. E, Resp Nos. 2-3; Gust Decl.

9    Exh. Q.

10   **III.    PLAINTIFFS FAIL TO MEET THEIR BURDEN OF ESTABLISHING**

11          **THE PROPRIETY OF CLASS CERTIFICATION**

12   Plaintiffs bear the burden of establishing the propriety of class certification,

13   which includes establishing an ascertainable class, and demonstrating that the

14   numerosity, commonality, typicality and adequacy requirements of Federal Rule of

15   Civil Procedure 23(a) and one of the provisions of Rule 23(b) are satisfied.  *Amchem*

16   *Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231 (1997); *Hanon v.*

17   *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  "Rule 23 does not set forth a

18   mere pleading standard."  *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Rather,

19   "[a] party seeking class certification must affirmatively demonstrate his compliance

20   with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently

21   numerous parties, common questions of law or fact, etc."  *Id.* (emphasis in original).

22   Certification is proper only if, after "rigorous analysis," which may entail some

23   overlap with the merits of the plaintiffs' claims, the prerequisites of Rule 23 are

24   satisfied.  *Id.* at 2551.  Because Plaintiffs have failed to meet their burden of

25   establishing the prerequisites to class certification, their motion must be denied.

26   _____

27   identify when a ported call resulted in a call received on a cell number that had been
     dialed using a landline number without an examination of the individual telephone

28   records of each individual putative class member.  Allen Decl. ¶ 11.

### A.   <u>The Putative Class and Subclasses Are Not Ascertainable</u>

"Before a class may be certified, it is axiomatic that such a class must be ascertainable." *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 557 (C.D. Cal. 2012) (citation omitted).  A class cannot be certified if a plaintiff has not "establish[ed] an objective way to determine" who is a member of the class. *Williams v. Oberon Media, Inc.*, 468 F. App'x 768, 770 (9th Cir. 2012) (affirming denial of class certification for lack of ascertainability).  Where the determination of who is in the class would require the court to "delve into the issues of liability," the class is not ascertainable, and class certification is improper.  *Vandervort*, 287 F.R.D. at 557-58.

Here, the class is not ascertainable because this Court would have to delve into the merits and hold mini-trials to determine which individuals consented to receiving phone calls from HGV.[9]  This conclusion is supported by the numerous recent decisions denying class certification, holding that evidence demonstrating that class members consented to the cellular calls renders the class unascertainable.  *See, e.g.*, *Gannon v. Network Tel. Servs., Inc.*, No. 2:12-cv-09777-RGK-PJW, 2013 WL 2450199, at *2-3 (C.D. Cal. June 5, 2013) (denying certification for lack of ascertainability where the facts of the case would require the court to hold "mini-trials" to determine who consented to receiving text messages); *Machesney v. Lar-*

---

[9] Courts have routinely held that where the plaintiff has voluntarily provided his cell phone number to the defendant, the plaintiff provided "prior express consent" to receiving a "call."  *See, e.g.*, *Emanuel v. Los Angeles Lakers, Inc.*, No. CV 12–9936–GW(SHx), 2013 WL 1719035 at *2-4 (C.D. Cal. April 18, 2013)(where plaintiff sent a text message to defendant, plaintiff consented to be contacted by defendant at the number he texted from); *Ibey v. Taco Bell Corp.*, 2012 U.S. Dist. LEXIS 91030, *7-8 (S.D. Cal. June 18, 2012) (plaintiff had "expressly consented" to being contacted by defendants when he sent defendant a text message); *Pinkard v. Wal-Mart Stores, Inc.*, 2012 U.S. Dist. LEXIS 160938, *8-16 (N.D. Ala. Nov. 9, 2012) (plaintiff expressly consented to receiving a text message from defendant by providing defendant her cell phone number).

1  *Brev of Howell, Inc.*, No. 10-10085, 2013 WL 1721150, at *18 (E.D. Mich. Apr. 22,

2  2013) (denying certification for lack of ascertainability where the definition yielded

3  multiple plaintiffs stemming from one potential fax transmission); *Jamison v. First*

4  *Credit Servs., Inc.*, No. 12-C-4415, 2013 WL 1248306, at *15-16 (N.D. Ill. Mar. 28,

5  2013) (denying certification for lack of ascertainability where the class definition

6  included thousands of individuals who consented to receiving calls on their cellular

7  telephones and thus had no grievance under the TCPA); *Vandervort v. Balboa*

8  *Capital Corp.*, 287 F.R.D. 554, 558-59 (C.D. Cal. 2012) (class was unascertainable

9  because the proposed class definition required determining who consented to receive

10  advertisements); *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 234-

11  35 (S.D. Ill. 2011) (class definition was overbroad and not ascertainable because the

12  definition required determination of who consented to receiving calls).

13       For example, in a case decided this month, the United States District Court for

14  the Central District of California denied class certification, finding that the class was

15  not ascertainable because the plaintiff's class definition "would require individual

16  inquiry into whether the potential class members consented to receiving text

17  messages." *Gannon*, 2013 WL 2450199 at *2.  There, the plaintiff sought to certify a

18  class consisting of all persons who "received one or more unauthorized text messages

19  sent by or on behalf of Defendants." *Id.*  Defendants submitted evidence that "some

20  of the recipients may have consented, because callers were explicitly informed that

21  they may be contacted by the company at the number from which they had been

22  called and provided an opportunity to opt-out of receiving such contact." *Id.*  The

23  court found certification "improper" because these facts would require the court to

24  hold "mini-trials" to determine who received unauthorized text messages in order to

25  determine class membership.  *Id.* at *3.

26       HGV submits even more compelling evidence that the Hilton family members

27  in the proposed putative class consented to the calls, requiring denial of class

28  certification.  In this case, the proposed class definitions would require the Court to

DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

1   make the following impermissible determinations of merit:  whether individuals were

2   called on their cell number; whether HGV used an ATDS; whether individuals

3   consented by voluntarily providing their cell numbers to Hilton; whether individuals

4   consented when joining the HHonors Program and agreeing to its Terms and

5   Conditions and Hilton's Global Privacy Policy; and whether individuals consented

6   when making reservations and/or providing their cell numbers at check in and

7   agreeing to Hilton's Global Privacy Policy.

8          Plaintiffs attempt to cure this issue by defining the class to exclude those

9   individuals who provided consent.  Courts call these "fail-safe" classes and have

10   rejected certification of these claims on the grounds that they impermissibly base

11   class membership on the ability to bring a successful claim on the merits.  *See*

12   *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 825-26 (7th Cir. 2012).

13   Such a definition is inconsistent with Rule 23(c)(3), which provides in part that a

14   judgment adverse to the class will bind all class members.   A class definition must be

15   rejected where it requires that a plaintiff either wins or, by virtue of losing, is defined

16   out of the class and is therefore not bound by the judgment.  *Messner*, 669 F.3d at

17   825; *see also Vandervort*, 287 F.R.D. at 557.  These definitions go to the heart of

18   whether each class member has a meritorious claim under the TCPA.  Defining the

19   purported class as all persons who received a call "without their express consent"

20   requires addressing the central issue of liability to be decided in this case.  *See*

21   *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D.Pa. 1995).

22          **B.     Plaintiffs Fail To Satisfy All The Requirements Of Rule 23(a)**

23                  **1.     Plaintiffs Failed to Demonstrate That There Are Questions**

24                          **Common to the Putative Class Resulting In Common Answers**

25          The commonality element of Rule 23(a) requires Plaintiffs to prove that the

26   putative classes not only suffered a violation of the same provision of law, but that

27   they suffered the same injury.  *Dukes*, 131 S. Ct. at 2551.  Plaintiffs must also

28   demonstrate that the class's injuries "depend upon a common contention" that is

"capable of classwide resolution." *Id.* at 2545.  Determination of the common contention's truth or falsity must resolve an issue that is central to the validity of each one of the claims in one stroke.  *Id.*  Plaintiffs' ability to raise common questions—even in droves—is irrelevant.  The classwide proceeding must generate common *answers* apt to drive the resolution of the litigation.  *Id.* at 2551.  Dissimilarities within the proposed class "impede the generation of common answers."  *Id.*  Here, the issue of consent prevents a finding that the class's injuries are capable of a classwide resolution.

Courts have repeatedly held that TCPA cases involving similar facts are not appropriate for certification based on the failure of commonality, typicality and predominance of individual issues.[10]  Here, liability can only be established if HGV called putative class members' cell numbers using an ATDS *without the recipient's prior express consent*.  *See* 47 U.S.C. § 227(b)(1)(A)(iii).  Commonality is not present because the ways in which potential class members voluntarily provided their consent varies greatly.  For instance, some individuals agreed to HHonors Terms and Conditions, some voluntarily provided their cell numbers during stays at Hilton properties, and others specifically requested information about HGV opportunities.  Therefore, the Court will need to determine a series of individualized issues with respect to the proposed classes, including whether:

- Voluntarily providing a cell number in connection with HHonors applications or reservations/check in constitutes express consent;

---

[10] *See, e.g.*, *Gene and Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 328 (5th Cir. 2008) (denying certification where numbers were acquired over time through a variety of factually different scenarios requiring individual inquiries concerning consent); *G.M. Sign, Inc. v. Brinks Mfg. Co.*, No. 09-C-5528, 2011 WL 248511, at *8 (N.D. Ill. Jan. 25, 2011) (individualized issues predominated where defendant set forth individual facts concerning express consent); *Versteeg v. Bennett, Deloney & Noyes, P.C.*, 271 F.R.D. 668, 674 (D. Wyo. 2011) (TCPA claims require extensive factual inquiries concerning express consent and the manner in which wireless numbers are provided).

- Online applicants to the HHonors Program consented to receiving calls when they voluntarily provided their cell numbers and clicked a box agreeing to the HHonors Terms and Conditions;

- Paper applicants to the HHonors Program consented to receiving calls when they voluntarily provided their cell numbers and were advised of the HHonors Terms and Conditions and that the Hilton Brands would contact them by telephone with special offers and promotions;

- Telephone applicants to the HHonors Program consented to receiving calls when they voluntarily provided their cell numbers in a conversation with no script informing the applicant of the HHonors Terms and Conditions;

- Online reservation guests consented to receiving calls when they were advised of the Global Privacy Policy prior to voluntarily providing their cell number and again in a confirmation email;

- Telephone reservation guests consented to receiving calls when they voluntarily provided their cell number in an unscripted conversation that did not notify them of the Global Privacy Policy and may or may not have received a confirmation email;

- OTA and/or travel agent guests consented to receiving calls when they booked reservations subject to their travel agents' terms and conditions and/or privacy policies and did not provide their contact information directly to the Hilton Brands and may or may not have received notice of Hilton's Global Privacy Policy;

- Persons who made reservations through third parties consented to receiving calls if the third party provided the number but may or may not have informed the guest of Hilton's Global Privacy Policy; and

- Hilton Guests consented to receiving calls when they provided a cell number at check in, in an unscripted conversation where they may or may not have been advised of Hilton's Global Privacy Policy.

Even the gripes posted on the Internet that Plaintiffs impermissibly cite, Ptfs. Mot. 3:9-4:13; 5:22-7:10, establish that certain guests consented to the calls. These posts unequivocally demonstrate the lack of commonality in the proposed classes confirming the guests' consent to the calls. Gust Decl. Exh. V, HGV4261-4262. For example, one such customer "complaint" involved a customer who believed that the vacation offer seemed "too good to be true" and expressly requested that HGV call him to present the deal again:

His concern was over a marketing call he received last night . . . The guest questioned whether [the HGV caller] was really from HGV, so [the HGV caller] had him call back at his extension, dialing the # found

1   on the website, and it did get him back to [the HGV caller].  However, he still *felt the deal was too good to be true*.  *He would like to check the validity of the deal, and if it's valid, he'll be happy to purchase the deal . . . I also told him that we would get back to him either way, which he requested.*

4   Gust Decl. Exh. V, HGV4261-4262.

5   Certification must be denied for lack of commonality where there is "no class-wide basis for distinguishing which recipients gave consent and which did not." *Gene and Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 328 (5th Cir. 2008).  Here, the facts compelling denial of certification are even stronger than *Gene*.  Similar to *Gene*, HGV has proven that the numbers it called were "collected over time and from a variety of sources." *Id.*, at 328-29.   The undisputed records and testimony provide that Hilton Guests and HHonors Members voluntarily provided their cell numbers in a variety of ways, including:  HHonors Applications made online, in paper and over the phone; reservations made online, over the phone, through OTAs, travel agents and third parties; and the check in process.  Like *Gene*, HGV has the "compelling argument."  The myriad of ways that Hilton Guests and HHonors Members consented to being called by providing Hilton with their cell numbers completely undermines Plaintiffs' argument regarding commonality.

18   In fact, Plaintiffs' motion completely ignores the myriad of ways in which potential class members consented by voluntarily providing their cell numbers. These ways include: joining the HHonors Program, staying at a Hilton property, checking in, and requesting information about HGV.  Plaintiffs cite to five inapposite cases wherein *all the numbers* were obtained in the *exact same manner*.  *See, e.g.*, *Manno v. Healthcare Revenue Recovery Grp.*, No. 11-61357, 2013 WL 1283881, at *8 (S.D. Fla. Mar. 26, 2013) (all numbers were acquired from the hospital admissions process); *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292, 293 (N.D. Cal. 2013) (all numbers were acquired from one third party marketing database); *Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 444 (N.D. Ohio 2012) (all

numbers were obtained from one third party marketing firm); *Mitchem v. Illinois Collection Serv., Inc.*, 271 F.R.D. 617, 620 (N.D. Ill. 2011) (all numbers were obtained from a health care provider); *Kavu, Inc. v. Omnipak Corp*, 246 F.R.D. 642, 647 (W.D. Wash. 2007) (all numbers were obtained from the same commercial database).

By contrast, there is no uniform manner in which HHonors Members or Hilton Guests provide their cell numbers to Hilton.  Where numbers are collected over time and from a variety of sources, class certification must be denied.  *Gene*, 541 F.3d at 328.  Here, unlike the cases relied on by Plaintiffs, the putative class members consented to being called by voluntarily providing their cell numbers over time in a variety of ways.  Therefore, class certification must be denied.

### 2.        Plaintiffs' Claims Are Not Typical of the Putative Class Members

In order to satisfy the typicality requirements of Rule 23(a)(3), Plaintiffs must prove the claims of the entire proposed nationwide class they seek to represent by proving their own claims.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020-21 (9th Cir. 1998).  Plaintiffs' claims do not cover the vast and varied situations experienced by potential class members.  On one hand, Mr. Connelly is a HHonors Member, who applied online, made all of his hotel reservations online, and provided the Hilton Brands with the cell number on which he allegedly received calls.  On the other hand, Mr. Merritt is not a HHonors Member, made his hotel reservations over the phone and through a third party, and provided the Hilton Brands with the cell number on which he allegedly received calls in connection with those reservations.

Plaintiffs' experiences are not reasonably co-extensive or even remotely similar to one another, let alone a significant portion of the nationwide subclasses they seek to represent.  The broader potential proposed class includes:  persons who ported their landline telephone number to a cellular telephone number; persons who utilized call forwarding to answer calls on their cellular phone; persons who utilized

1  VoIP services; persons who mistakenly identified HGV as the entity calling them;

2  paper HHonors applicants; telephone HHonors applicants; Hilton Guests who made

3  reservations through OTAs or travel agents; and Hilton Guests who provided their

4  cell number to the Hilton Brands during the check in process for the first time.

5      C.   **Plaintiffs Fail To Meet The Requirements of Federal Rule of Civil**

6          **Procedure 23(b)(3)**

7          1.    **Plaintiffs Fail To Demonstrate That Common Questions**

8                  **Predominate**

9      Rule 23(b)(3) requires a proposed class representative to demonstrate that

10  "questions of law or fact common to class members *predominate* over any questions

11  affecting only individual members."  Fed. R. Civ. P. 23(b)(3) (emphasis added).

12  Although similar to the commonality requirement of Rule 23(a), the Rule 23(b)(3)

13  requirement is "far more demanding because it tests whether proposed classes are

14  sufficiently cohesive to warrant adjudication by representation."  *Gene*, 541 F.3d at

15  326.  In evaluating predominance under Rule 23(b)(3), this Court must identify the

16  substantive issues that will control the outcome, assess which issues will

17  predominate, and then determine whether those issues are common to the class or will

18  result in the degeneration of the case into a series of individual trials.

19      The substantive issues that will control the outcome of this case are whether

20  members of the proposed classes received calls on their cell numbers, from an ATDS,

21  without consent.  As described above, each of these inquiries turns on various

22  circumstances unique to each putative class member's interactions with Hilton.

23  Resolution of each of these substantive issues will degenerate into a series of

24  individual trials.  Therefore, predominance is not met and this case is not suitable for

25  certification.  *G.M. Sign, Inc.*, No. 09-C-5528, 2011 WL 248511, at *8-10 (N.D. Ill.

26  Jan. 25, 2012) (issues of consent predominated over common issues precluding

27  certification in a TCPA case); *Versteeg*, 271 F.R.D. at 674 (TCPA would require

28  extensive individual fact inquiries regarding consent that predominated over common

DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

1   issues).

2          **2.      Plaintiffs Fail To Demonstrate That A Class Action Is the**

3                     **Superior Method Of Adjudication**

4          Certification should be denied because adequate incentives exist for individuals

5   to prosecute their claims, and on the ground that a class certification would result in

6   enormous damages, completely out of proportion to any harm suffered by the

7   plaintiff.  *See London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 n.5 (11th Cir.

8   2003).  The TCPA provides adequate incentives for individuals to prosecute their

9   claims and, therefore, certification is not the superior method of adjudicating this

10  case.  *Freedman v. Advanced Wireless Cellular Commc'ns., Inc.*, No. SOM-L-611-

11  02, 2005 WL 2122304, at *2 (N.J. Super. Ct. June 24, 2005) (vacating TCPA class

12  certification, noting significant legislative history evidencing that class actions were

13  not intended under the TCPA).  "The drafters [of the TCPA] recognized that damages

14  from a single violation would ordinarily amount only to a few pennies worth of ink

15  and paper usage, and so believed that the $500 minimum damage award would be

16  sufficient to motivate private redress of a consumer's grievance through a relatively

17  simple small claims court proceeding, without an attorney."  *Levine v. 9 Net Ave.,*

18  *Inc.,* No. A-1107-00T1, 2001 WL 34013297, at *1 (N.J. Super. App. Div. June 7,

19  2001); *Forman*, 164 F.R.D. at 404 (the TCPA is designed to provide adequate

20  incentive for an individual plaintiff to bring suit).  In other words, "[a] class action

21  would be inconsistent with the specific and personal remedy provided by Congress to

22  address the minor nuisance of unsolicited facsimile advertisements."  *Forman*, 164

23  F.R.D. at 405; *Murphey v. Lanier*, 204 F.3d 911, 913 (9th Cir. 2000) (TCPA claims

24  should be treated as "small claims best resolved in state courts"), *abrogated on other*

25  *grounds by Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740 (2012).

26         In addition, class treatment fails to meet the "superiority" requirement because

27  HGV's liability "would be enormous and completely out of proportion to any harm

28

DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

suffered by the plaintiff." *London,* 340 F.3d at 1255 n.5.[11]  For example, the court in *Forman* emphasized that statutory damages of $500 per violation exceeded any actual monetary loss or lost time suffered by plaintiffs and that the $500 damages available under the TCPA were sufficient.  *Forman*, 164 F.R.D. at 404-05.  The court found the $500 damages provided for in the TCPA were sufficient "to provide adequate incentive for an individual plaintiff to bring suit on his own behalf" and obviate the need for the class action mechanism.  *Id*. at 404.

Plaintiffs seek to recover statutory damages on behalf of a class that far exceed any actual damages suffered.  Although Plaintiffs have refused to provide HGV with a statement of their actual damages, their damages are nominal or non-existent.  For the months in which both Mr. Merritt and Mr. Connelly received calls from HGV, their regular cell phone bills collectively totaled less than $1,000 dollars.[12]  These amounts comprise all fees payable by Plaintiffs for their cellular plans and are not attributable to any calls from HGV.  Plaintiffs did not incur any additional charges as a result of HGV's calls.  Even if this Court includes the "annoyance" of receiving marketing calls from a hotel brand both Plaintiffs trust, their actual damages pale in comparison to the $10,000 to $21,000 that Plaintiffs could recover pursuant to the

---

[11] *See, e.g.*, *Legge v. Nextel Commc'ns, Inc.*, No. CV-02-867 DSF (VNKX), 2004 WL 5235587, at *13 (C.D. Cal. June 25, 2004) (denying certification where statutory damages ranged from $150 million to $1.5 billion); *Blanco v. CEC Entm't Concepts L.P.*, No. EDCV-07-90-ODW (COPx), 2008 WL 239658, at *2 (C.D. Cal. Jan. 10, 2008) (denying certification of class seeking damages of $1.9 billion); *In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328, 350-51 (N.D. Ill. 2002) (denying class certification where statutory damages exceeding $19 billion were "grossly disproportionate to any actual damage"); *Wilson v. Am. Cablevision of Kansas City, Inc.*, 133 F.R.D. 573, 578-79 (W.D.Mo. 1990) (denying certification where plaintiff sought class damages of up to $27 billion).

[12] Mr. Connelly's cellular phone bill was roughly $185.00 per month when he received HGV's calls.  Mr. Merritt's phone bill was approximately the same when he received HGV's calls.  Neither Plaintiff exceeded their minutes because of HGV's calls.  Taken together, Plaintiffs actual damages are less than $1,000.

statutory damages provisions of the TCPA.  The absurdity of the damages sought becomes even clearer when damages are aggregated across the entire nationwide class, yielding a potential damage award of between $18 and $57 billion.

Plaintiffs' effort to seek tens of billions of dollars in statutory damages, based on little or no actual or at best miniscule harm, "shock[s] the conscience" and cannot support the certification of a class.  *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 234-35 (9th Cir. 1974) (potential damages awards that "shock the conscience" require denial of class certification under Rule 23(b)(3)).  The superior mechanism for resolving Plaintiffs' claims is not a class action, but rather individual actions brought by persons who truly wish to end the calls they are receiving from HGV.  Individual actions, not a lawyer-driven class action, are the superior method for Plaintiffs to pursue any claims they may have.

### D.    Plaintiffs' Request For Certification Under Rule 23(b)(2) Lacks Merit

This Court may not certify a class under Rule 23(b)(2) unless the ultimate relief sought relates exclusively or predominantly to money damages.  Fed. R. Civ. P. 23(b)(2), Advisory Comm. Note (1966); *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1186 (9th Cir. 2007).  In evaluating a Rule 23(b)(2) class, courts must examine the specific facts and circumstances and focus predominantly on the plaintiff's intent in bringing the suit.  *Id.*  The court must find that the predominant relief is injunctive and declaratory, while monetary damages are secondary.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195, *as amended*, 273 F.3d 1266 (9th Cir. 2001).  It is the plaintiff's burden to show that monetary damages are merely incidental to a primary request for injunctive relief.  *Blackwell v. Skywest Airlines, Inc.*, 245 F.R.D. 453, 466 (S.D. Cal. 2007).  It is not sufficient that injunctive relief be among the remedies sought where the realities of litigation make clear that the suit was brought primarily for money damages.  *Elliott v. ITT Corp*, 150 F.R.D. 569, 576 (N.D. Ill. 1992).  The Supreme Court has expressed "growing concerns regarding the certification of

DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

1  mandatory classes when monetary damages are involved." *Ticor Title Ins., Co. v.*

2  *Brown*, 511 U.S. 117, 121 (1994) (stating that there is "at least a substantial

3  possibility" that actions seeking monetary damages are only certifiable under Rule

4  23(b)(3)).

5       Plaintiffs seek statutory damages in the amount of $500 per negligent violation

6  and $1,500 for each willful and/or knowing violation of the TCPA.  Plaintiffs have

7  repeatedly argued to this Court that HGV dialed approximately 37 million telephone

8  calls during the statutory period.  Based on this number, a potential judgment in this

9  case could range from $18 to $57 billion dollars, a number that shocks the

10 conscience.  When Plaintiffs' claim for billions of dollars of damages is compared to

11 their assertion that they were "fed up with these annoying telemarketing calls," it

12 becomes clear that the primary remedy sought in this case is damages.  Significantly,

13 Plaintiffs have spent little time addressing injunctive relief.  Instead, Plaintiffs focus

14 most of their time and efforts on the monetary value of this case.  This demonstrates

15 that this lawsuit does not achieve the desired results of a proper class action.

16 **IV.**    **CONCLUSION**

17      For all the reasons stated above, HGV respectfully requests that this Court

18 deny Plaintiffs' motion for class certification.

19 Dated:  June 14, 2013               Respectfully submitted,

20

21                                     LINER GRODE STEIN YANKELEVITZ
                                       SUNSHINE REGENSTREIF & TAYLOR LLP

22

23                                     By:  *s/ Angela C. Agrusa*
                                            Angela C. Agrusa

24                                          Attorneys for Defendant
                                            HILTON GRAND VACATIONS

25                                          COMPANY, LLC

26

27

28

DEFENDANT HILTON GRAND VACATIONS COMPANY, LLC'S OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

1 | Randall J. Sunshine (SBN 137363)
       rsunshine@linerlaw.com
2 | Angela C. Agrusa (SBN 131337)
       aagrusa@linerlaw.com
3 | Sterling L. Cluff (SBN 267142)
       scluff@linerlaw.com
4 | LINER GRODE STEIN YANKELEVITZ
   | SUNSHINE REGENSTREIF & TAYLOR LLP
5 | 1100 Glendon Avenue, 14th Floor
   | Los Angeles, California 90024
6 | Telephone:   (310) 500-3500
   | Facsimile:   (310) 500-3501

7

8

9                    **<u>CERTIFICATE OF SERVICE</u>**

10          I hereby certify that on June 14, 2013, I electronically filed the foregoing with

11    the Clerk of the Court using the ECF System which sent notification of such filing

12    to the following:

13
      Charles T. Mathews, Esq.
14    George S. Azadian, Esq.
      Zack I. Domb, Esq.
15    Mathews Law Group
      37 E. Huntington Drive, Suite A
16    Arcadia, California 91006
      Telephone:   (626) 683-8291
17    Facsimile:   (626) 8295

18

19

20

21

22

23

24

25

26

27

28